**ZEN CONTINENTAL CO., INC., Plaintiff,**

v.

**INTERCARGO INSURANCE COMPANY, International Advisory Services, Inc., Trade Insurance Services, Inc., Defendants.**

No. 00 Civ. 1165(GEL).

United States District Court, S.D. New York.

March 22, 2001.

David Y. Loh, Niccoletti Hornig Campise & Sweeney, New York, New York, for Plaintiff Zen Continental Co., Inc.

Brendan J. Malley, Mendes & Mount LLP, New York, New York, for Defendants Intercargo Insurance Company, International Advisory Services, Inc., and Trade Insurance Services, Inc.

## OPINION AND ORDER

LYNCH, District Judge.

█ Plaintiff Zen Continental Company, Inc. ("Zen") brought this declaratory judgment action against its insurer, Defendant Intercargo Insurance Company ("Defendant" or "Intercargo"), and certain other parties,[1] in the wake of two misadventures on the high seas involving cargo originating from the People's Republic of China. The primary issue in the case is whether Intercargo has a duty to defend certain claims brought against Zen, under a maritime insurance policy.[2]

---

1. On May 22, 2000, Zen filed a notice of voluntary dismissal, dismissing claims with prejudice that it had asserted against The Roanoke Companies, Inc., Roanoke Agency, Inc., Roanoke Brokerage Services, Inc. and Roanoke Trade Services, Inc. Only the parties listed in the caption remain.

2. The Court has admiralty jurisdiction over this action, pursuant to 28 U.S.C. § 1333, because claims arising out of a maritime in-

Zen and Intercargo (joined by an affiliated company, International Advisory Services, Inc. ("IAS")) have filed cross-motions for summary judgment, pursuant to Fed.R.Civ.P. 56(c). Defendant Trade Insurance Services, Inc., ("TIS") has moved to dismiss the action as to it on various grounds. For the reasons that follow, Intercargo's motion for summary judgment and TIS's motion to dismiss are granted, and Zen's motion is denied.

## BACKGROUND

Unless otherwise specifically noted, the following facts are not controverted by the parties.

### The Insurance Policy

Zen's business involves a variety of shipping-related activities. Most notably for purposes of this litigation, until 1999 it acted as a non-vessel owning common carrier ("NVOCC") of goods shipped from Asia to the United States. (Yen Decl. ¶¶ 2–3.) An NVOCC in effect acts as a middleman in the shipping process. Among other things, an NVOCC facilitates the delivery of cargo from its shipper to the vessel that will be responsible for transporting the cargo to its ultimate destination, and issues a bill of lading to the ship's captain.[3] (Yen Decl. ¶ 3.) An NVOCC often assists shippers in booking cargo space on vessels by consolidating several smaller lots together. By doing this, the NVOCC obtains much lower prices for a constituent shipper than the shipper would otherwise be able to find if it were to engage in one-on-one negotiations with the vessel owner. *Prima U.S. Inc. v. Panalpina, Inc.*, 223 F.3d 126, 129 (2d Cir.2000).[4]

In 1992, defendant TIS acted as a broker for both Zen and Sunway Line, Inc. ("Sunway") (apparently one of Zen's subsidiaries),[5] by assisting in procuring a liability policy (the "Policy") from Intercargo to cover certain risks attendant on Zen's business as an NVOCC. The parties first executed the Policy, styled an "International Transit Liability Insurance Policy," on April 15, 1992, and, following three consecutive annual renewals, it remained in effect until at least April 15, 1996. (Second Amended Compl. ¶¶ 19–20; Llaneta Aff. Ex. 1.)[6]

The Policy specified that Zen would receive coverage for the following occurrences:

(a) physical loss or damage to customers' cargo arising out of the issuance of your bill of lading when conducting your business as a consolidator (principal), or;

(b) financial loss resulting from your negligence committed in conducting

---

surance policy sound in admiralty. *See, e.g., Sirius Ins. Co. (UK) Ltd. v. Collins*, 16 F.3d 34, 36 (2d Cir.1994) (citing *Insurance Co. v. Dunham*, 78 U.S. (11 Wall.) 1, 29–35, 20 L.Ed. 90 (1870)).

3. A bill of lading serves multiples purposes, including proof of "receipt of goods, contract for their carriage, and ... documentary evidence of title to goods." *Black's Law Dictionary* 168 (6th ed.1990).

4. For a more complete description of an NVOCC's role in the shipping process, *see, e.g., id.; M. Prusman Ltd. v. M/V Nathanel*, 670 F.Supp. 1141, 1143 (S.D.N.Y.1987).

5. While the precise relationships among the parties are not entirely clear in the record, Zen has not suggested in its motion papers that there is any functional distinction between itself and Sunway (or another entity called Eastern Sunway Line, Inc.).

6. The policy provided in the record was actually issued on May 4, 1995. The parties appear to agree that either this policy or one essentially identical to it was in force on all dates relevant to this action.

your business as an International Transportation Specialist.

(Llaneta Aff. Ex. 1 at 1.) Additionally, the Policy contained a standard provision that required Intercargo to defend Zen under certain scenarios:

> We will defend a suit for a *covered claim* even if the suit is groundless or fraudulent. We have the right to adjust, investigate, negotiate and settle any suit or claim. We will pay all costs of investigating and defending the suit, including interest on any covered part of any judgment provided that the amount does not exceed the applicable limit of coverage.... *The term "claim" means any oral or written demand received by you or a suit against and served upon you for money damages....* We have no duty to defend any claim that is not covered by this agreement and we will not pay you or any protected persons for any loss of earnings.

(*Id.;* original italics, other emphasis added).

As is characteristic of most insurance policies, however, Intercargo incorporated numerous exclusions in the Policy that operated to deny coverage for certain risks. With regard to the instant litigation, the most significant such exclusion (captioned "Hazardous Materials/Pollution/Contamination") reads as follows:

> We will not cover any claims for environmental damage, pollution, or contamination of any kind however caused, including but not limited to: claims arising out of accidental, sudden or gradual, foreseeable or unforeseeable, intentional or unintentional occurrences.
>
> We will not cover *any claims* arising out of *any* activity, transaction, incident or occurrence involving any explosives;

pressurized gases; nuclear parts, fuels, materials or devices; *hazardous,* radioactive, *toxic;* [*sic*] [7] or *flammable* materials; any weapons or armaments; or any means of biological or chemical warfare.

> Further, we will not cover claims arising out of the actual, alleged or threatened discharge, disposal, release or escape of pollutants in any stage of storage, handling or transportation; whether accidental, sudden or gradual, foreseeable or unforeseeable, intentional or unintentional.
>
> Pollutants mean but are not limited to: any solid, liquid, gaseous, thermal, radioactive, sonic, magnetic, electric or organic irritant; contaminant; or anything which causes or contributes to damage, injury, adulteration, or disease. This includes, but is not limited to smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste.

(*Id.* at 6; emphasis added.)

Additionally, the Policy contains a clause that precludes Zen from commencing a court proceeding against Intercargo if Zen were to bring the action "after one (1) year after the accident/incident" that gives rise to, for example, a putative duty to defend. (*Id.* at 14.)

*The Accidents Aboard the Cho Yang Park and the Tokyo Senator*

On February 13, 1994, Zen issued a bill of lading to the captain of the vessel Hanjin Bangkok to transport eighty drums of salicylaldehyde from Tianjin in the People's Republic of China to the port of Busan in the Republic of Korea. (Intercargo Rule 56.1 Statement ¶ 6 & Ex. 1.) Salicylaldehyde is a liquid chemical that can be used innocuously in low doses as a constituent ingredient of perfumes. How-

---

7. Given the grammatical structure of this clause, it seems that the semi-colon that appears after the term "toxic" is a scrivener's error that should be replaced by a comma.

ever, it becomes corrosive in much higher concentrations, and upon exposure can cause a variety of skin, eye and respiratory ailments.[8] (Green Aff. ¶¶ 12–13; Intercargo Rule 56.1 Statement ¶ 18 & Ex. 7 at 2.) Zen's cargo of salicylaldehyde arrived without incident in Busan, and, following Zen's issuance of another bill of lading, was loaded onto the Cho Yang Park for transport to New York City.

The Cho Yang Park set sail from Busan on February 23, 1994. (Yen Decl. Ex. H.) On March 13, 1994, apparently while en route to Savannah, Georgia (the ship's first port of call in the United States), at least one of the drums containing the chemical leaked into the ship's hold, supposedly because the drum had been loaded improperly. (Intercargo Rule 56.1 Statement ¶ 8; Yen Decl. Ex. J.) Consequently, the Cho Yang Park's owners incurred approximately $20,000 of expenses, including, among other things, cleanup costs and fines and penalties imposed by certain governmental authorities. (Amended Verified Compl. ¶ 7.)[9]

Another Zen shipment made later in 1994 sustained an even worse fate. On March 25, 1994, Zen issued another bill of lading to the captain of the Hanjin Bankgok to transport 300 drums of thiourea dioxide from Tianjin to Busan. (Intercargo Rule 56.1 Statement ¶ 9 & Ex. 3.)

Thiourea dioxide is a solid chemical that exists as a whitish crystal and is sometimes referred to as formamidinesulfinic or aminoiminomethanesulfinic acid. It is commonly used in manufacturing processes as a reducing agent.[10] (Green Aff. ¶ 4 .) Thiourea dioxide is widely regarded by chemists as a hazardous and toxic compound, and various federal agencies; including the United States Department of Transportation and the United States Environmental Protection Agency, enumerate it on hazardous substances lists. Rats exposed to the chemical in laboratory experiments have suffered damage to various internal organs, including their lungs and spleens.[11] (Green Aff. ¶¶ 5–6.) Other experiments performed on animals indicate that thiourea dioxide may be a human carcinogen. (Intercargo Rule 56.1 Statement ¶ 19 & Ex. 8 at 1.) It can be highly volatile when exposed to temperatures close to the boiling point of water (212 degrees Farenheit), often emitting poisonous gases such as sulfur dioxide and ammonia. (Id. ¶ 7–8.)

After the Hanjin Bangkok arrived in Busan, Zen issued a bill of lading to the captain of the Tokyo Senator to transport the drums containing thiourea dioxide to New York City. (Intercargo Rule 56.1 Statement ¶ 9 & Ex. 3.) The ship apparently departed from Busan on March 28, 1994, and sailed toward Norfolk, Virginia, its

---

8. As described by Intercargo's chemicals expert, salicylaldehyde is an organic compound that is a member of the "phenol family of chemicals." (Green Aff. ¶ 12.) · A phenol chemical is a ". . . derivative of benzene used in dilute form as an antiseptic and disinfectant." *Oxford Dictionary and Thesaurus* 1119 (American ed.1996).

9. For purposes of this motion, the Court assumes the truth of all factual allegations made against Zen in actions commenced against it in both this District and the United States District Court for the Eastern District of New York.

10. A reducing agent is a "substance that brings about reduction by oxidation [a process used to, among other things, create certain metals] and losing electrons." *Oxford Dictionary and Thesaurus* at 1259.

11. Indeed, a document issued to Zen by the manufacturer of the thiourea dioxide suggested it was "highly recommended" that anyone involved in handling the chemical wear "rubber gloves, goggles and [a] respirator." (Yen Decl. Ex. G at 3.)

first port of call in the United States. (Yen Decl. Ex. H.). As the Tokyo Senator approached Norfolk's harbor on April 28, 1994, at least one of the thiourea dioxide drums spontaneously ignited. Other containers then caught fire, resulting in damages (including various cleanup costs) of more than $1 million to, among other things, the ship's hold and other cargo affected by the blaze. (Yen Decl. Exs. A & K.) The following day, Zen promptly notified TIS (its insurance broker) by letter about the Tokyo Senator incident and enclosed certain documents, including the bills of lading that Zen had issued. (Yen Decl. ¶ 5 & Ex. A.) It is uncertain from the evidentiary record presented by the parties as to whether TIS forwarded the materials to Intercargo for further review.

### Claims Asserted Against Zen

On May 15, 1995, Zen was served with a summons and an amended verified complaint in an admiralty action ("the Eastern District Action") commenced against it in the United States District Court for the Eastern District of New York. *Senator Linie GmbH & Co. KG a.k.a. Senator Lines v. Zen Continental Co., Inc., et al.*, 95 Civ. 1733 (Amon, D.J.).[12] (Malley Reply Aff. Ex. 1 at 3.) The complaint alleged, among other things, that (1) Zen had issued bills of lading for "chemicals" transported by the Cho Yang Park and the Tokyo Senator, (2) the chemicals on the Cho Yang Park leaked into the hold of the ship, resulting in approximately $20,000 of damages for which Zen was allegedly jointly and severally liable, (3) the chemicals aboard the Tokyo Senator "spontaneously ignited inside the container," resulting in approximately $1.2 million of damages for which Zen and other named defendants were alleged to be jointly and severally liable. (Amended

Verified Compl. ¶¶ 3, 6–11.) On December 27, 1995, Judge Carol Bagley Amon entered an order transferring the action to this District, where it was assigned to Judge Miriam Goldman Cedarbaum under docket number 96 Civ. 8. (*See* Malley Reply Aff. Ex. 1 at 4.)

Subsequently, on May 22, 1995, Zen was served with a summons and verified complaint in an admiralty action commenced in this District against, among other parties, two of its apparent subsidiaries—Eastern Sunway Line, Inc. ("Eastern Sunway") and Sunway Line, Inc ("Sunway"). *Insurance Co. of North America a/s/o Burlington Coat Factory and Daniel Young Int'l v. M.V. Tokyo Senator, her engines, etc., et al.*, 95 Civ. 3303(KTD) ("the Southern District Action") (Llaneta Aff. Ex. 5.) The complaint alleged that Eastern Sunway and Sunway acted as NVOCCs for the 300 drums of thiourea dioxide on board the Tokyo Senator, which (as detailed above) "experienced a violent chemical reaction" prior to the vessel's arrival in Norfolk on April 28, 1994. (Verified Compl. ¶ 32.) Plaintiffs alleged that as a consequence of the accident, Eastern Sunway and Sunway are jointly and severally liable for damages sustained to the following cargo located adjacent to the burning containers of thiourea dioxide: (1) ladies' jackets destined for the Burlington Coat Factory, valued at $365,420 and (2) mens' jackets destined for Daniel Young International, valued at $5,749.50. (*Id.* ¶ 41.) Judge Kevin Thomas Duffy later reassigned the action to Judge Cedarbaum.

Judge Cedarbaum proceeded to consolidate the two actions for a bench trial. In a Finding of Facts and Conclusions of Law, issued on March 9, 2001, she ruled,

---

**12.** Earlier in 1995, Zen had apparently received a claim arising out of the Tokyo Senator incident, which it forwarded to Intercargo. (Yen Decl. ¶ 6 & Ex. B.)

among other things, that Zen and its affiliated companies were not liable for any of the damages caused by the fire aboard the Tokyo Senator on March 28, 1994.[13] *Insurance Co. of North America, a/s/o Burlington Coat Factory, et al. v. M/V Tokyo Senator, et al.,* 95 Civ. 3303(MGC) and 96 Civ. 0008(MGC) (S.D.N.Y. Mar. 9, 2001).

### Intercargo's Refusal to Defend

By letter dated May 19, 1995, Zen notified TIS about the Eastern District Action and provided TIS with copies of the amended verified complaint filed in the action and bills of lading that Zen had issued for transporting the drums of thiourea dioxide and salicylaldehyde. (Yen Decl. Ex. C.) On May 22, 1995, Zen notified TIS by letter that it had been served with a summons by the plaintiff in the Southern District Action. (Yen Decl. Ex. F.) The following day, Zen sent additional materials to TIS, including a Material Safety Data Sheet for thiourea dioxide specifying, among other things, that it was "highly recommended" that handlers of the chemical wear "rubber gloves, goggles and [a] respirator."[14] (Yen Aff. Ex. G at 3.) Zen, by letter dated May 25, 1995, once again supplemented its disclosures to TIS, providing basic information about the chemical cargo on the two vessels and the accidents in question. (Yen Decl. Ex. H.) TIS proceeded to forward the documentation to Intercargo on May 25, 1995. (Yen Decl. Ex I.)

By letter dated June 1, 1995, Intercargo notified Zen that, following a review of the complaints filed in the Eastern and Southern District Actions, it was not obligated to provide any coverage to Zen under the Policy. Intercargo based its position on the hazardous materials/pollution exclusion clause embodied in the Policy. With regard to the Eastern District Action, Intercargo noted in its letter that the claim against Zen "ar[ose] out of the leakage of certain chemicals." (Yen Decl. Ex. J at 1.) As for the Southern District Action, Intercargo stated that the subrogated plaintiff's claims concerned "alleged damage to [the] assureds' goods as a result of the chemical leak." (*Id.* at 3.) Nevertheless, Intercargo invited Zen to provide any "further information and/or documentation relevant to [your] claim. We would be pleased to review these [*sic*] information and/or documentation as they may relate to any possible changes in our position regarding coverage of this claim." (*Id.*)

On July 19, 1999—more than five years after the accidents aboard the two vessels and more than four years after Intercargo initially denied coverage—Zen once again requested that Intercargo provide policy coverage for claims relating to the accidents aboard the Cho Yang Park and the Tokyo Senator. Zen based its position on documentation purporting to illustrate that an international maritime organization had not classified thiourea dioxide as a "hazardous material" as of 1994 (Yen Decl. ¶ 18; Intercargo Rule 56.1 Statement Ex. 10.) By letter dated September 28, 1999, Intercargo reaffirmed its original denial of coverage, noting that the accidents in question were excluded from coverage because they resulted from materials that were "toxic or flammable" and/or "pollutants." (Yen Decl. ¶ 18 & Ex. L at 3.)

---

**13.** Judge Cedarbaum did not make any findings of fact concerning the accident aboard the Cho Yang Park.

**14.** Zen also furnished copies of a "[s]hipper's declaration" and "[s]urvey report by Maritime Bureau Inc. for the goods on Cho Yang Park," which details the consequences of the accident aboard that vessel. (Yen Decl. Ex. G at 1.)

### The Instant Action

On February 16, 2000, Zen brought a declaratory judgment action in this Court against Intercargo, TIS and IAS.[15] With regard to Intercargo, Zen alleged the following claims (many of which appear to be cumulative) in its Second Amended Complaint: (1) breach of contract (Count I) arising out of failures to defend Zen in the Eastern and Southern District Actions and provide indemnification under the policy for claims arising out of those actions; (2) breach of duty of good faith (Count II) to provide Zen with comprehensive liability coverage; (3) breach of duty of good faith (Count III) to advise Zen of its right to supplement the Policy with additional liability coverage; (4) negligence (Count IV), apparently regarding Intercargo's putative dereliction of its duty to defend Zen or provide coverage under the Policy; and (5) breach of duty of good faith arising out of a failure to defend Zen in the Eastern and Southern District actions (Count V). (Second Amended Compl. ¶¶ 40–61.) Intercargo subsequently asserted a counterclaim for a declaratory judgment that the Policy did not provide coverage for the accidents underlying the claims asserted against Zen in the Eastern and Southern District Actions. (Answer ¶¶ 69–70.) [16]

TIS vehemently objected to its inclusion as a defendant in the instant action. In a letter to Zen's counsel dated July 5, 2000, TIS's counsel stated, among other things, that TIS had strong personal jurisdiction and statute of limitations defenses, and would seek the imposition of sanctions and an award of attorneys' fees and costs if Intercargo did not voluntarily dismiss. TIS from the action. (Malley Reply Aff. ¶ 3 & Ex. 3.) Counsel for Zen apparently did not respond to the letter.

Accordingly, on August 1, 2000, TIS moved to quash service of process pursuant to Fed. R. Civ. P 12(b)(5), and to dismiss the claims asserted against it in the Second Amended Complaint for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1), lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2) and failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). In support of the personal jurisdiction motion, Intercargo submitted an affidavit from one of its officers who averred that Intercargo has no contacts whatsoever (much less minimum contacts) with New York State, the forum state for this action. (Malley Aff. Ex. C.) Zen failed to oppose the motion, and at oral argument, counsel for Zen conceded that TIS was not a proper party to this action and that all claims asserted against it should therefore be dismissed. (Tr. at 17–18.) In response, TIS has sought sanctions, attorneys' fees and costs arising out of "unnecessary motion practice." (Malley Reply Aff. ¶ 7; Tr. at 24–26.)

On October 6, 2000, Intercargo moved for summary judgment on the claims asserted against it in the Second Amended

---

**15.** Although Zen enumerated IAS in the caption of its complaint, it failed to allege any claims against IAS or set forth even a rudimentary theory as to how it might be liable for the acts of an affiliated corporation. In fact, except for alleging that it is an Illinois corporation (¶ 9), and setting forth its alleged corporate relationships to the other parties (¶¶ 15–17), the pending Second Amended Complaint does not even mention any action of IAS. For this reason alone, as Zen conceded at oral argument (Tr. at 27), IAS is entitled to dismissal of the action for failure to state a claim against it.

**16.** Intercargo is permitted to seek a declaratory judgment because the actions in which Zen requests that Intercargo exercise a putative duty to defend were pending as of the date Intercargo made its motion. See, e.g., Sears, Roebuck and Co. v. Seneca Ins. Co., 254 Ill. App.3d 686, 194 Ill.Dec. 57, 627 N.E.2d 173, 178 (1993).

Complaint and on its counterclaim for a declaratory judgment that Zen was not entitled to coverage under the Policy. IAS also moved for summary judgment as a consequence of not being named as a party to any of the counts asserted by Zen. Zen cross-moved for summary judgment against Intercargo on November 6, 2000.

On February 9, 2001, the Court heard oral argument from counsel for the parties regarding all pending motions and TIS's application for attorneys' fees and costs. At oral argument, in addition to conceding that TIS was not a proper party, Zen's counsel also conceded (1) that IAS was not a proper party and should be dismissed from the action and (2) that all tort claims asserted against Intercargo should be dismissed. (Tr. at 26.)

## DISCUSSION

### I. *Intercargo and Zen's Cross–Motions for Summary Judgment*

#### A. *Choice of Law*

■ The Supreme Court has held that in the absence of a specifically-applicable admiralty rule, state substantive law governs cases about marine insurance policies. *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 321, 75 S.Ct. 368, 99 L.Ed. 337 (1955). In this case, the Policy contains a choice-of-law clause specifying that it is to be construed "in accordance with the Maritime and Admiralty Laws of the United States and the Laws of the State of Illinois." (Llaneta Aff. Ex. 1 at 16.) Accordingly, the parties have briefed all of the issues raised in the cross-motions on the assumption that the action is governed by Illinois law.

#### B. *Standard for Summary Judgment*

Generally, summary judgment may only be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party opposing summary judgment "may not rest upon mere allegations or denials", rather it must "set forth specific facts showing that there is a genuine issue for trial." Fed R. Civ. P. 56(e). In the instant action, however, neither party contends that any genuine issues of material fact exist, and the dispute concerns pure issues of law and contract interpretation, matters quintessentially reserved for summary adjudication under Illinois insurance law. *Roman Catholic Diocese of Springfield in Illinois v. Maryland Cas. Co.*, 139 F.3d 561, 565 (7th Cir.1998).

#### C. *Statute of Limitations*

Intercargo first argues that it is entitled to summary judgment on Zen's claim that Intercargo breached the Policy's duty-to-defend clause, because that claim is time-barred by a contractually-specified statute of limitations.

■ The Policy provides that Zen may not commence a civil action against Intercargo arising out of any putative breach unless Zen does so within "one (1) year after the accident/incident." (Llaneta Aff. Ex. 1 at 14.) Although such a limitations period is much shorter than that which is specified by statute,[17] Illinois law clearly allows parties to an insurance policy to set what is tantamount to a private statute of

---

**17.** Absent a contractual limitations provision, Illinois law provides that an action alleging a breach of a duty to defend must be commenced within 10 years after the claim's accrual. Il. St. Ch. 735 § 5/13–206 (West. 2000); *Employers Ins. of Wausau v. Ehlco Liquidating Trust*, 309 Ill.App.3d 730, 243 Ill. Dec. 384, 723 N.E.2d 687, 699–701 (1999).

limitations. *See, e.g., Affiliated FM Ins. Co. v. Board of Education of the City of Chicago,* 23 F.3d 1261, 1264 (7th Cir.1994). Indeed, courts treat such contractually-specified periods as equivalent to time bars provided for by statute. *See generally Koclanakis v. Merrimack Mut. Fire Ins. Co.,* 899 F.2d 673, 675 (7th Cir.1990) (noting that contractual limitations period would bar the civil action "unless the limitation period was tolled.").

Zen instituted the instant action well after the period in which it was required to do so had run. The Cho Yang Park (salicylaldehyde) accident occurred on March 13, 1994, and the Tokyo Senator (thiourea dioxide) fire on April 28, 1994. (Intercargo Rule 56.1 Statement ¶ 9 & Ex. 3; Yen Decl. Exs. A, J & K.) The Southern and Eastern District Actions against Zen were filed, and Intercargo refused to defend them, by letter dated June 1, 1995. (Yen Decl. Ex. J. at 1.) However, Zen waited until February 16, 2000—nearly six years after it first learned about the accidents and nearly five years after Intercargo first denied coverage—to bring its declaratory judgment action. On its face, therefore, this action is time-barred by the limitations period set forth in the Policy.

■ In opposition, Zen first argues, without citing any authorities in its favor, that Intercargo is estopped from asserting a statute of limitations defense because it failed to conduct an independent investigation of the accidents that gave rise to the Eastern and Southern District Actions.[18] However, no such duty exists under Illinois law, which requires only that an insurer compare the policy at issue to the complaint served on the insured. *See, e.g., Outboard Marine Corp. v. Liberty Mut. Ins. Co.,* 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204, 1212 (1992). If the insurer

determines after making the comparison that "there clearly was no coverage or potential for coverage," then the duty to defend does not exist. *Employers Ins. of Wausau v. Ehlco Liquidating Trust,* 186 Ill.2d 127, 237 Ill.Dec. 82, 708 N.E.2d 1122, 1135 (1999) (*"Wausau"*).

Second, Zen contends that Illinois law precludes Intercargo from relying on a contractual statute of limitations to circumvent a duty to defend (Pl.'s Mem. Opp'n Summ. J. at 6–8.) In support of its argument, it cites principally to *Wausau.* In that case, the Illinois Supreme Court held, among other things, that an insurer is precluded from avoiding a duty to defend an insured simply because the insured failed to provide timely notice of a claim (a condition precedent for coverage that is often required under a policy). *Id.* at 1136.

It is hardly clear that the decision in *Wausau* extends so far as to excuse a lengthy delay in seeking adjudication of an insured's rights under an insurance policy, in the face of a clear limitations provision. In *Wausau,* the court refused to allow an insurer who had refused to defend to rely on a procedural condition precedent to coverage to defeat a covered claim. Here, Zen did not simply fail to provide timely notice before seeking coverage; rather, after submitting a claim and being clearly advised that Intercargo denied coverage, it chose to sleep on any rights it had and failed to seek judicial resolution of a ripe dispute about the terms of the Policy. If *Wausau* extended to that situation, an insured would have *carte blanche* to bring a declaratory judgment action at its convenience—even if it waited so long (more than 10 years, for example) that the action would otherwise be time-barred under Illinois' statutory limitations period for duty-to-defend claims. Such an expansive rule

---

**18.** Zen first raised this argument at oral argument. (Tr. at 15–16.)

would conflict with the insurance laws of numerous jurisdictions that have facilitated the use of contractual limitations periods to bar duty-to-defend claims. *See, e.g., Nicodemus v. Milwaukee Mut. Ins. Co.,* 612 N.W.2d 785, 786–87 (Iowa 2000); *College of Notre Dame of Maryland, Inc. v. Morabito Consultants, Inc.,* 132 Md.App. 158, 752 A.2d 265, 272–73 (Md. Spec.App.2000) (discussing *Amalgamated Cas. Ins. Co. v. Helms,* 239 Md. 529, 212 A.2d 311 (1965)), *CBS Broadcasting, Inc. v. Fireman's Fund Ins. Co.,* 70 Cal. App.4th 1075, 83 Cal.Rptr.2d 197, 201–02 (1999); *Issa v. Reliance Ins. Co. of New York,* 685 F.Supp. 47, 48 (S.D.N.Y.1987) (applying New York law). Zen does not contend that there was any ambiguity about Intercargo's denial of coverage, or that it relied to its detriment on any conduct of Intercargo's in failing to bring a timely action. *See Koclanakis,* 899 F.2d at 676. Under these circumstances, and in the absence of Illinois authorities holding that the principles regarding the interplay of a condition precedent defense and an insured's duty to defend are equally applicable to a contractual limitations defense, the Court is reluctant to extend *Wausau* in the manner contemplated by Zen.

When exploring unchartered areas of state law, however, a federal court must be mindful of its limited expertise in state law—especially in the law of a jurisdiction other than the forum state – and of the undesirability of reaching out unnecessarily to decide novel issues of state law. *Cf. Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). It is unnecessary, on the facts of this case, to decide whether *Wausau* would defeat Intercargo's statute of limitations argument, if Intercargo actually had a duty to defend Zen in the Eastern and Southern District Actions. The *Wausau* Court reached the late-notice defense issue only after it first determined that the insurer actually had a duty to defend under the policy at issue there. *Id.* at 1129–31. Accordingly, if the Court determines that Intercargo is not required to defend Zen based on the allegations of the Eastern and Southern District Complaints, the applicability of *Wausau* becomes moot. Thus, reversing the usual order of proceeding, it is appropriate here to consider the merits of Zen's duty-to-defend claim, and to reach the statute of limitations claim only in the event that Intercargo has breached its obligations.

### D. *Duty to Defend*

Under Illinois insurance law, an insurer is not required to defend an insured if it is "clear from the face of the underlying complaint" against the insured that the "facts alleged ... [do not] fall within, or potentially within, the policy's coverage." *Outboard Marine Corp.,* 180 Ill.Dec. 691, 607 N.E.2d at 1212.[19]

■ Construing the complaint and the policy language is a matter of law committed exclusively to the court's determination. In addressing that question, a court must first, by construing the policy as a whole, consider "the subject matter that is insured and the purposes of the entire contract." *Outboard Marine Corp.,* 180 Ill.Dec. 691, 607 N.E.2d at 1212. Then, in construing specific policy terms, "a court

---

**19.** Zen argues that *Wausau* stands for the proposition that an insurer must either bring an action to obtain a declaratory judgment of no coverage or defend the insured under a reservation of rights. (Pl.'s Mem. Opp'n Summ. J. at 7.) However, the Illinois Supreme Court states with unmistakable clarity that an insurer may simply decline to defend if the claims asserted against the insured do not fall within the scope of the Policy's coverage. *Wausau,* 237 Ill.Dec. 82, 708 N.E.2d at 1135. *See also Maneikis v. St. Paul Ins. Co. of Illinois,* 655 F.2d 818, 821–22 (7th Cir.1981).

must afford them their plain, ordinary, and popular meaning." *Id.* If the policy terms are "susceptible to more than one reasonable interpretation, they are ambiguous and will be construed in favor of the insured and against the insurer who drafted the policy." *Id.* However, in making this inquiry, "[the] court should not search for ambiguity where none exists." *River v. Commercial Life Ins. Co.* 160 F.3d 1164, 1169 (7th Cir.1999). Moreover, to avoid creating unintended redundancies in a policy, the court "must strive to give each term in the policy meaning unless doing so would render the clause or policy inconsistent or inherently contradictory." *American Fire & Cas. Co. v. Broeren Russo Constr., Inc.,* 54 F.Supp.2d 842, 846 (C.D.Ill.1999) (citing *State Farm Fire & Cas. Co. v. Martin,* 186 Ill.2d 367, 238 Ill.Dec. 126, 710 N.E.2d 1228 (1999)).

■ Evaluating the Policy as a whole in the instant case, it is readily apparent that, given the broadly-worded hazardous materials/pollution exclusion clause (and the numerous other exclusionary clauses in the Policy, *see* Llaneta Aff. Ex. 1 at 4–9), the Policy was not intended to provide Zen with comprehensive coverage in its capacity as an NVOCC. This is presumably because an NVOCC, under well-established admiralty principles, is strictly liable for any damage caused to cargo that has been shipped pursuant to a bill of lading that it issued. *See, e.g., Prima U.S.,* 223 F.3d at 129. Nothing about the overall contours of the policy, then, suggests that the exclusions should be read in any other way than by giving them "their plain, ordinary, and popular meaning." *Outboard Marine Corp.,* 180 Ill.Dec. 691, 607 N.E.2d at 1212.

■ Turning to the specific exclusionary provisions, Intercargo argues that Zen is precluded from coverage because its cargo contained "pollutants" that caused resultant damage on board the respective vessels. (Def.'s Mem. Supp. Summ. J. at 8–16.) However, at least in the context of an ordinary Comprehensive General Liability policy, the Illinois Supreme Court has held that generic pollution exclusion clauses (such as the pertinent portion of the exclusionary language at issue in the instant case) only relate to claims that arise out of industrial environmental pollution. *American States Ins. Co. v. Koloms,* 177 Ill.2d 473, 227 Ill.Dec. 149, 687 N.E.2d 72, 79 (1997).[20] Although this ruling may not apply in the particular context of a marine policy issued to an NVOCC, the Illinois courts might well find that because the complaints against Zen did not allege that the cargo caused environmental damage outside of the ships' hulls, the Policy's language excluding pollutants is ambiguous when applied to the facts alleged in the complaints.

■ The clause relied on by Intercargo, however, does not apply only to pollution. Intercargo also contends that the accidents on board the Cho Yang Park and the Tokyo Senator were precipitated by "hazardous," "toxic," or "flammable" materials shipped by Zen, and the exclusion applies

---

**20.** The language at issue in that case read, in pertinent part, as follows:

This insurance does not apply to:
f.(1) 'Bodily injury or 'property damage' arising out of actual, alleged, or threatened discharge, dispersal, release or escape of pollutants....
[Pollutants are defined as] any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.
*American States,* 227 Ill.Dec. 149, 687 N.E.2d at 74. As the court noted, this type of clause has been interpreted variously in different jurisdictions. See *Bernhardt v. Hartford Fire Ins. Co.,* 102 Md.App. 45, 648 A.2d 1047 (1994), and cases collected in *American States,* 227 Ill.Dec. 149, 687 N.E.2d at 78.

to such materials as well as to "pollution." (Def.'s Mem. Supp. Summ. J. at 8–16.) While certain aspects of the exclusion apply to "pollutants" and "environmental damage," and thus may be susceptible to the limiting construction applied by the court in *American States,* the clause here is, and apparently is intended to be, broader.

The language of the exclusionary clause in question supports Intercargo's argument. The heading for the section ("Hazardous Materials/Pollution/Contamination") contains three terms that appear to have been consciously set off from one another with slashes. The first and third paragraphs, which contains terms including "environmental damage," "contamination," and "pollutants," cover two of the three topics listed in the heading. The second paragraph of the exclusion reads:

> We will not cover *any claims arising out of any activity, transaction, incident or occurrence* involving any explosives; pressurized gases; nuclear parts, fuels, materials or devices; *hazardous,* radioactive, *toxic; or flammable materials;* any weapons or armaments; or any means of biological or chemical warfare.

(Llaneta Aff. Ex. 1 at 6; emphasis added.) Nothing in this section limits the exclusion to environmental damage caused by the release of pollutants into the air or water; rather, the provision excludes *"any"* claim arising from the shipment of a wide range of hazardous cargo. Particularly when read in conjunction with the heading of this exclusionary section, it is evident that

this paragraph has separate force as a broad "hazardous materials" exclusion. Illinois insurance law requires that each term in an insurance policy must be accorded independent meaning. *American Fire & Cas. Co.,* 54 F.Supp.2d at 846. Thus, under a natural reading of the exclusionary language, accidents will be excluded from coverage if they fall within *any* of the three clauses.[21]

The policy terms themselves illustrate the breadth of Intercargo's intended exclusion. The Policy excludes *"any* claims arising out of *any activity, transaction, incident or occurrence involving"* materials that are "hazardous" or "toxic" (emphasis added)—broadly worded language that would, on its face, include instances such as those alleged in the Eastern and Southern District Actions where damage resulted from cargo shipped under bills of lading that it issued. Indeed, the policy language does not require any showing that a cargo's intrinsically dangerous properties triggered the accident in question. For example, if Zen were to ship a hazardous liquid chemical that leaked from its container and damaged other cargo simply by wetting it, a claim for such damage would be excluded even though the damage was garden variety and had nothing to do with the chemical's dangerous properties. Accordingly, if thiourea dioxide and salicylaldehyde fall within the definitional scope of any one of the three terms at issue, Intercargo would not have a duty to defend Zen in the Eastern or Southern District Actions.[22]

---

**21.** Zen argues in opposition that the entire exclusion, when read thematically, relates exclusively to accidents and activities involving pollution. (Pl.'s Mem. Opp.'n Summ. J. at 10–13.) But this "gestalt" argument is inconsistent with Illinois' insistence that each term be given separate meaning. Moreover, when compared to the generic pollution exclusionary language used by the insurance industry

(which is quoted above in note 20), it is quite clear that Intercargo intended to exclude a far wider array of accidents from coverage.

**22.** Judge Cedarbaum's ruling on March 9, 2001, that Zen was not responsible as a matter of admiralty law for the damages caused by the spontaneous combustion of thiourea dioxide aboard the Tokyo Senator does not

■ An examination of the pertinent allegations made against Zen in the Eastern and Southern District Complaints shows that the claims "aris[e] out of an[ ] ... incident or occurrence involving ... hazardous [or] toxic" materials, and thus that the Policy does not cover Zen for any accidents arising out of its shipment of thiourea dioxide and salicylaldehyde. In the Eastern District Complaint, the plaintiff made, in pertinent part, the following allegations about the chemicals shipped on the Cho Yang Park:

● Zen and its subsidiaries were "acting on behalf of" the shippers of eighty drums of chemicals enumerated in the bill of lading that Zen had issued to the captain of the Cho Yang Park. (Amended Verified Compl. ¶¶ 2(a), 3.) [23]

● Sometime during the voyage to the United States, the chemicals, which had been improperly "pack[ed], stuff[ed], block[ed], brac[ed] and prepar[ed] for shipment ... leaked out of their drums, and out of the cargo shipping container, into the hold of the ship." (Id. ¶ 7.)

● Consequently, the plaintiff suffered approximately $20,000 in damages. (Id.)

The Eastern District Complaint also alleged the following about the events that transpired on the Tokyo Senator:

● Zen and its subsidiaries were "acting on behalf of" the shippers of 300 drums of chemicals enumerated in the bill of lading that Zen had issued to the captain of the Tokyo Senator. (Id. ¶¶ 2(a), 3.) [24]

● The chemicals were "inherently dangerous and/or defective" and at a time uncertain during the ship's voyage "spontaneously ignited inside the container." (Id. at ¶¶ 9–10.)

● As a result of the fire caused by the chemicals, plaintiff incurred approximately $1.2 million of expenses. (Id. at ¶¶ 10–11.)

In the Southern District Complaint, the plaintiff makes the following allegations about the events that transpired on board the Tokyo Senator:

● Eastern Sunway Line, Inc. and Sunway Line, Inc. (entities which are apparently Zen's subsidiaries) acted as NVOCCs for 300 drums of "Thiourea Dioxide" that would be shipped from "Pusan [sic], Korea to Norfolk." (Verified Compl. ¶¶ 11–12.)

● Sometime before docking in Norfolk, "the thiourea dioxide experienced a violent chemical reaction" within the ship's hold, "causing damage to cargo stowed in areas adjacent" to the chemical in the amount of $371,169.50. (Id. ¶¶ 32, 34.)

As for the exclusionary terms in question, one commonly-used dictionary has primarily defined "hazardous" as "risky, dangerous." [25] The Oxford Dictionary and Thesaurus 674 (American ed.1996). The legal definition of the term is quite similar: "Exposed to or involving danger; perilous; risky; involving risk of loss." Black's Law Dictionary 719 (6th ed.1990). The term "toxic," for purposes of both contemporary and legal usage, has been defined as "of or

---

alter this conclusion. The Policy does not require a showing of fault on Zen's part to trigger the exclusionary clauses at issue in the instant action, any more than it requires Intercargo to defend only meritorious claims against Zen.

23. The chemical is listed on the bill of lading as "salicylaldehyde." (Llaneta Aff. Ex. 2.)

24. The chemical is listed on the bill of lading as "thiourea dioxide." (Llaneta Aff. Ex. 2.)

25. Synonyms of "hazardous" include the following: "unsafe, unsound, risky, dangerous, shaky, questionable, unreliable, unpredictable, precarious, uncertain [and] chancy." The Oxford Dictionary and Thesaurus at 674.

relating to poison," [26] *The Oxford Dictionary and Thesaurus* at 1617; *Black's Law Dictionary* at 1492.[27]

Zen concedes that the damage on board both the Cho Yang Park and the Tokyo Senator resulted from the shipment of, respectively, salicylaldehyde and thiourea dioxide. (*See* Zen's Rule 56.1 Counterstatement ¶¶ 8, 11.) And given the extrinsic evidence proffered by Intercargo, which Zen has failed to controvert, the two chemicals were both "hazardous" and "toxic." Salicylaldehyde, according to Intercargo's expert, can, upon exposure, inflict various injuries to the skin, eyes and respiratory tract. (Green Aff. ¶¶ 12–13.) Thiourea dioxide is a possible human carcinogen that has been known to cause organ damage in rats that were exposed to the chemical in laboratory experiments. (Intercargo Rule 56.1 Statement ¶ 19 & Ex. 8 at 1; Green Aff. ¶¶ 5–6.) Upon decomposition, the chemical emits poisonous gases including sulfur dioxide and ammonia. (Green Aff. ¶¶ 7–8.) Consequently, these chemicals are both "toxic" (because they inflict injury upon living organisms that have the misfortune of being exposed to them) and "hazardous" (in various ways, such as being dangerous to human health), and therefore fall well within the scope of the Policy's exclusionary language.[28]

Zen presents no evidence disputing Intercargo's description of the properties of either chemical. Instead, Zen contends that thiourea dioxide is not a hazardous material for the purpose of Policy's exclusion, because the chemical was not considered "hazardous" by a variety of maritime organizations at the time of the accident. (*See* Pl.'s Mem. Opp'n Summ. J. at 9–13 & McNamara Aff.) [29] This argument fails, however, because Illinois law requires terms in insurance policies to be given their ordinary meanings. *See Outboard Marine Corp.*, 180 Ill.Dec. 691, 607 N.E.2d at 1212. Neither the Policy nor Illinois decisions incorporate any particular list of hazardous chemicals, or provide that the Policy's terms should be interpreted according to specialized industry standards. The standards averred to by Zen's expert, Captain James McNamara, only concern labeling requirements for certain "hazardous" substances, and do not purport to serve as omnibus definitional guides that insurers must consider when deciding whether to exercise a duty to defend. Moreover, even if thiourea dioxide were not considered "hazardous," Zen does not, and indeed cannot, controvert Intercargo's

**26.** "Poison" is defined in the same dictionary as "a substance that when introduced into or absorbed by a living organism causes death or injury." *The Oxford Dictionary and Thesaurus* at 1151.

**27.** Illinois case law makes clear that it is appropriate for a court to consult dictionaries when determining the "plain, ordinary and popular meaning" of terms in an insurance contract. *See, e.g., Outboard Marine Corp.*, 180 Ill.Dec. 691, 607 N.E.2d at 1216 (defining "damages" by, among other things, utilizing *Webster's Third New International Dictionary*); *Canadian Radium & Uranium Corp. v. Indemnity Ins. Co. of North America*, 411 Ill. 325, 104 N.E.2d 250, 254 (1952) (using *Webster's* to define "accident").

**28.** Intercargo's argument that the chemicals are "flammable" is somewhat less availing. Intercargo's expert admits in his affidavit that salicylaldehyde "is not an especially flammable material." (Green Aff. ¶ 14.) Thiourea dioxide, on the other hand, can spontaneously combust at temperatures approaching the boiling point of water (*Id.* at ¶ 10), which certainly seems to fall within the dictionary definition of "flammable"—which means "easily set on fire." *The Oxford Dictionary and Thesaurus* at 553

**29.** Zen does not provide similar evidence about salicylaldehyde.

argument that thiourea dioxide is a "toxic" material, therefore placing it outside the scope of the Policy's coverage.

Accordingly, because the accidents aboard the Cho Yang Park and the Tokyo Senator resulted from "hazardous" and "toxic" cargos being shipped by Zen, Intercargo is entitled to summary judgment that the claims asserted against Zen in the Eastern and Southern District Actions were not covered by the Policy.

## II. TIS's Application for Attorneys' Fees and Costs

■■■ TIS seeks attorneys' fees and costs incurred in moving to dismiss Zen's action against it. Citing 28 U.S.C. § 1927, which provides that an attorney who "multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally" expenses incurred as a result of his action, TIS argues that Zen and its counsel acted in bad faith by refusing to withdraw its claims against TIS after being presented with powerful arguments that the Court lacked personal jurisdiction over it. (TIS Post–Argt. Mem. 2–3.)

In response, Zen argues that it had a good faith basis for including TIS in this lawsuit. (Loh Aff. ¶¶ 1–8.) But this contention somewhat misses the point. Whatever basis Zen initially had for believing that it could prevail against TIS, that basis had apparently evaporated by the time TIS filed its motion to dismiss, as Zen failed to oppose that motion. Since TIS presented the basis of its arguments to Zen's counsel, both orally and in writing, before the motion was filed, and specifically requested that Zen withdraw its claims,

it is difficult to understand why Zen ignored TIS's request and forced it to file a formal motion.

A court cannot condone such behavior by counsel. Lawyers have an obligation, to their adversaries and to the Court, not to persist in frivolous claims, requiring opposing parties and the Court to expend resources considering claims that are no longer viable. Counsel for TIS acted appropriately in presenting his arguments to his adversary before making his motion, and lawyers to whom such a presentation is made have a professional obligation to consider it seriously. Section 1927 permits a court to require compensation when that professional obligation is breached, and this Court will not hesitate to do so in appropriate circumstances.

■■■ Nevertheless, § 1927 authorizes an award of costs only in narrow circumstances. Our Court of Appeals has cautioned that the statute should be construed "narrowly and with great caution," so as not to stifle zealous advocacy. *Mone v. C.I.R.*, 774 F.2d 570, 574 (2d Cir.1985). Moreover, a district court must deny a sanctions application unless there has been " 'a clear showing of bad faith on the part' " of counsel, which "may be inferred 'only if the actions [by counsel] are so completely without merit as to require the conclusion that they must have been taken for some improper purpose such as delay.' " *Salovaara v. Eckert*, 222 F.3d 19, 35 (2d Cir.2000) (quoting *Shafii v. British Airways, PLC*, 83 F.3d 566, 571 (2d Cir. 1996)).[30] Finally, even where the statutory standard is met, § 1927 by its terms (*"may* be required") confides an award of fees against counsel to the Court's discre-

---

**30.** Other courts have noted that in order to impose sanctions under this statute, willful bad faith on the part of counsel must be found, *see, e.g., Williams v. Giant Eagle Markets, Inc.*, 883 F.2d 1184, 1191 (3d Cir.1989), although this position is not universally held. *See, e.g., Braley v. Campbell*, 832 F.2d 1504, 1512 (10th Cir.1989) (en banc) (stating that a district court may infer bad faith from actions of counsel).

266

tion. *See, e.g., Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 154 (2d Cir.1997). On this record, I conclude that discretion counsels against an award.

First, I find that Zen did have a good faith basis to bring suit against TIS in the first instance. Thus, TIS was legitimately required to engage in "fact intensive [inquiry] about the nature of TIS'[s] activities in New York," "research of the law of several states" concerning the time-bar issues, and development of a "novel" argument concerning admiralty jurisdiction over cases involving marine insurance brokers (TIS Post–Argt. Mem. at 4–5), in order to develop the arguments for dismissal presented to Zen in advance of the motion. Indeed, TIS appears to agree that Zen's counsel can be criticized only for failing to drop the suit after these arguments were presented, and not for bringing the suit in the first place. Thus, the only unnecessary expenses incurred are the relatively modest ones associated with turning TIS's letter to Zen into a formal motion. Moreover, there is no evidence that Zen or its counsel deliberately persisted in its position in order to impose these unnecessary costs on TIS. It is not unheard-of for lawyers to think they have a plausible argument until they actually attempt to write a brief. Finally, I am influenced by the fact that Zen did not consume further resources by submitting a frivolous response to TIS's motion, and I am reluctant to give future litigants an incentive to do so by (in effect) treating Zen's failure to oppose the motion as the smoking gun that justifies an award of sanctions.

For these reasons, the application for attorneys' fees and costs is denied.

## CONCLUSION

Intercargo's motion for summary judgment is granted. Zen's motion for sum-

mary judgment is denied. TIS's motion to dismiss and IAS's motion for summary judgment are granted on consent. TIS's motion for attorneys' fees and costs is denied. Intercargo is directed to submit an appropriate form of judgment, on notice to opposing counsel, within ten days.

SO ORDERED.